UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION

MICHAEL GARNER,
Petitioner,
v.

MICHAEL THOMPSON,
Respondent.

Civil Action No. 05-30035-MAP

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HIS PETITION FOR HABEAS CORPUS

The petition for habeas corpus should be allowed because the state decisions are based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), and involve an unreasonable application of clearly established Federal law. 28 U.S.C. § 2254(d)(1).

### I. The State Court Adjudication

The petitioner is satisfied with the recitation of proceedings in state court as set out in the respondent's memorandum of law in opposition to the petition for habeas corpus ("respondent's memorandum").

### II. Facts

The following facts are pertinent to the two issues being pressed in this petition. First, that the findings of the trial court, [Tr. II:80-82; RM, p.4,5][1], in denying the defendant's motion

---

[1] References to the transcripts in the respondent's second supplemental answer will be by Tr. volume and page, as [Tr. II:80-82], to the respondent's memorandum by RM, and page, as [RM, p.4], and to the documents in the respondent's supplemental answer by Tab and page, as [Tab D, p. 20]. **NOTE**: While the Second Supplemental Answer (Transcripts) identifies three volumes of transcripts the second of which Vol II–Trial is the transcript of both the First Trial, Unlawful Possession Trial, and the Second Trial, Enhanced Sentencing Trial. The First Trial encompasses pages Tr. II:1-106, while the Second Trial encompasses Tr. II:106-139.

for a required finding of not guilty in the first trial, are unreasonable in that the facts presented at trial do not support beyond a reasonable doubt the inference that the defendant possessed a firearm or ammunition. *See:* Argument I of defendant's brief and defendant's petition for further appellate review, Tab D, pp.8-16, and Tab B, pp.8-10. Second, that trial counsel was ineffective for failing to move for a required finding of not guilty at the sentencing enhancement trial, second trial. [Tab G, pp.7-9; Tab D, pp.22-29; Tab B, pp.10-18].

FIRST TRIAL-Unlawful Possession Trial

The Defendant's case:

According to defense witness Katherine Hill, a twenty year friend of Michael Garner, they spent most of the day together eventually ending up in the early morning of November 6, 1998 at 152 College Street. [Tr. II:85,86]. Grace Long and her son lived at 152 College Street, neither Katherine Hill nor Michael Garner lived there. [Tr. II:97]. Prior to the police arrival various individuals visited the apartment dropping in and out. Mary Picard arrived by herself at about 3:30 (a.m.) and left alone about twenty minuets later. [Tr. II:86,87]. Katherine Hill, Michael Garner, a woman named Pat Davis, and a man named Jeff were in the apartment when Mary Picard arrived.[Tr. II:87,88]. Shortly after Mary arrived Annie Clark dropped in. Annie stayed a short time leaving about ten minuets after Mary. [Tr. II:87,88]. This left Pat Davis, Michael Garner, Jeff and Katherine Hill in the apartment. [Tr. II:88]. Jeff was showing the people present the firearm marked as exhibit #1 which he had in his possession. [Tr. II:90,91]. About a half hour to forty-five minutes after Mary Picard left and about ten minuets after Jeff took out the firearm to show to everyone, Katherine looked out the window and saw the police arrive. [Tr. II:88,91]. She informed the others of this fact and they all reacted in their own way

while she went downstairs to let the police in.[Tr. II:89,90]. After letting the police in Ms. Hill did not return upstairs. [Tr. II:95]. Ms. Hill never saw Mr. Garner with a gun. [Tr. II:95].

The Commonwealth's case:

Officer Jacques testified that on November 6, 1998, he and his partner, Officer Toledo, were working the midnight shift in uniform police car. [Tr. II:68,69]. At about 4:00a.m. they proceeded to 152 College Street to investigate a crime. [Tr. II:69,71]. In the car with them was a civilian with whom they had a conversation concerning events that took place at 152 College Street.[Tr. II:70]. Officer Jacques had requested assistance with the investigation and at about the same time that he arrived at 152 College Street, Officers Barker and McCain arrived in another marked police car. [Tr. II:70,71]. The officers surrounded the two story duplex, upstairs/downstairs, apartment building.[Tr. II:71,72,33]. Officer Jacques noticed that the first floor apartment was boarded up with the doors locked and nailed shut. [Tr. II:72]. After the Officers were in position, Officer McCain called to Officer Jacques that someone was coming down stairs and to open the door on the side of the house where he was.[Tr. II:72,73]. Officer Jacques met a K. Hill at the door and had a conversation with her, after which he brought her to the front of the house before eventually entering the second floor of 152 College Street. [Tr. II:73,74].

Officer McCain testified that he was assigned to the midnight detective bureau and he (and his partner) were working the midnight to eight uniform shift on November 6, 1998, when they received a call from Officers Toledo and Jacques to assist them at 152 College Street.[Tr. II:29-32]. The two police cars arrived at 152 College Street at approximately the same time and detective McCain noticed a civilian female in the car of Officers Toledo and Jacques.[Tr. II:32].

3

While detective McCain did not speak with this female he was aware that Officers Toledo and Jacques had spoken with her and based on his decisions with them he was expecting to find approximately four people in the apartment at 152 College Street. [Tr. II:32, 33]. While the officers were positioning themselves on each side of the building, [Tr. II:33], detective McCain heard scuffling and walking around from upstairs and observed a female peeking out the window.[Tr. II:34]. This female then came down and opened the door for detective McCain who proceeded to the second floor apartment. The first floor was vacant. The first room he entered at the top of the stairs was the kitchen.[Tr. II:35, 37,38]. There was no electricity in the apartment but the kitchen was lit by a flame coming from a stove or a candle.[Tr. II:38]. A black female and a black male were sitting at the kitchen table.[Tr. II:38]. Detective McCain remained in the kitchen for only a brief time before commencing a protective sweep to insure that there was no one else in the apartment.[Tr. II:38-40]. The first room Detective McCain went to after leaving the kitchen contained a walk in closet which, he observed, had mounds of clothes scattered all across the floor.[Tr. II:39,40]. The detective saw that there was no door on the closet, [Tr. II:39], nor were there any shelves or hanging clothes in the closet which was just jam-packed full of clothing scattered all over the floor. [Tr. II:50,51]. The detective estimated the size of the closet to be about 6ft. 5in. deep and about 3 ft. wide. [Tr. II:50]. The detective saw a weapon,[2] with the barrel facing towards him on the right side of the closet, [Tr. II:40], about three feet inside the door way. [Tr. II:51]. The detective did not see anyone in the closet. [Tr. II:502]. It being early in the morning it was dark and as there was no electricity in the

---

[2] Exhibit #1 was a nine millimeter weapon and exhibit #2 was the magazine. [Tr. II:43]. There was also a stipulation, Exhibit #4, that the firearm seized is a working firearm as defined by law and the ammunition seized is ammunition.[Tr. II:23,44].

apartment detective McCain's observations were made with the aid of a flash light.[Tr. II:52].

Detective McCain yelled that there was a weapon and took a step forward about a foot and a half into the closet. [Tr. II:53]. He felt he was stepping on somebody's leg. [Tr. II:53]. This is what caused him to first became aware that there was a person in the closet. [Tr. II:55]. The individual was laying the long way in the closet. [Tr. II:55]. Detective McCain yelled he had a suspect and reached down and grabbed the suspect's hands.[Tr. II:45,46]. The only thing between the suspect and the gun were clothes. [Tr. II:45].

SECOND TRIAL - Enhanced Sentencing Trial

Over the defendant's objection the Commonwealth elicited testimony from Officer Prentice, a Springfield Police Department fingerprint expert, that, from his review of Springfield Police Department records, the fingerprints from booking records dated November 6, 1998, November 6, 1995, June 4, 1994 and January 13, 1993 belonged to the same individual, a Michael Garner whose date of birth was July 27, 1961. [Tab D, p.6]. The Commonwealth then introduced certified copies of court documents from which the trier of fact could infer that the named Michael Garner either admitted to facts sufficient or pled guilty to all or some of the charges associated with the booking records of November 6, 1995, June 4, 1994 and January 13, 1993. [Tab D, p.7].

III. **The Finding of the Judge in a Jury Waived Trial, Upheld by the State Appellate Courts, Rests on Impermissible Speculation Unsupported by the Evidence Presented at Trial and as such is Contrary to the Defendant's Federal and State Constitutional Guarantee to Proof Beyond A Reasonable Doubt..**

From the facts it can not reasonably be determined that the defendant knew the gun was in the closet. Even if the Court, the trier of fact, discredits the testimony of defense witness

Katherine Hill that an individual named Jeff was the owner of a weapon which he was showing to her, Pat Davis and Michael Garner about ten minutes before the police arrived, the police officers' testimony establish the following facts:

a) That the police were expecting to find four individuals at 152 College Street.

b) After their arrival, while the police were positioning themselves on each side of the apartment detective McCain heard scuffling and walking around coming from the upstairs apartment.

c) No one left or entered the building after the police arrived and surrounded it.

d) The police found four individuals at 152 College Street,. Ms. Hill who opened the door, a female and a male sitting in the kitchen and Mr. Garner under the clothes in the closet.

e) What the police expected to find and did find was consistent with Ms. Hill's testimony as to who was in the apartment ten minutes prior to the police arrival.

f) There was no electricity in the apartment which was dark save for a candle or flame coming from the stove in the kitchen.

g) The closet in which Mr. Garner was found was about six and a half feet long by three feet wide.

h) Mr. Garner was lying length wise in the closet with his head away from the entrance, covered by dirty clothes.

i) He was not visible to the police, even with the aid of a flash light.

j) The gun was lying on top of the dirty clothes on the right side of the closet about three feet in from the doorway.

k) There were no fingerprints on the gun.

l)     Mr. Garner was discovered when Detective McCain stepped into the closet to retrieve the weapon and stepped on Mr. Garner's leg.

m)     The apartment was Grace Long's and Michael Garner did not live there.

"When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Caraballo*, 33 Mass. App. Ct. 616, 619 (1992)(citations omitted). To conclude that the defendant knew that there was a weapon in plain view on the clothes above him the Court surmised that the defendant, hidden beneath the clothes, placed the gun above the clothes in plain view ". . . in hopes that the police would pick up the gun and walk away, rather than find his body under the mound of clothing." [Tr. II:80-82, RM, p. 4,5]. Of course, the opposite happened. The gun drew the officer into the closet making the discovery of Mr. Garner essentially inevitable. If Mr. Garner's intent was for the gun to be discovered so he would not be discovered, would not leaving the gun somewhere outside the closet have been more effective in deterring the police from doing what every T.V. viewer knows they do, conduct a thorough sweep of the apartment to insure their safety?

To deny this petition this Court must find not that the far more likely scenario, given our common sense and experience, that after Garner was hidden, whether or not with the assistance of the others, the gun was left in plain view by someone else for the purpose of implicating Garner and deflecting suspicion from them, which is in fact what happened, is more unreasonable than the trial court's finding. Rather, this Court would have to show how the undisputed facts derived at trial permit, beyond a reasonable doubt, the inference drawn by the trial court that the defendant knew the gun was in the closet. This is not a case of the evidence

tending to equally sustain two inconsistent propositions. The inconsistent (speculative) propositions, the one reached by the court or the one postulated above, are not equal, nor is either germane to proving the defendant had knowledge of the gun. Here the facts are that there were three people in an apartment (and one answering the door) where a gun was found. All of them were present in the apartment when the scuffling and moving around was heard. All of them had equal access to the weapon in the closet prior to the time that the police arrived in the kitchen. The Commonwealth can not prove beyond a reasonable doubt who possessed the gun by merely showing, as here, who was closest to the weapon at the time of its discovery. Each individual could have put the gun in the closet.

Of course, on the facts of this case the Commonwealth can not convict any of the apartment occupants of possession. Woefully missing from this case is any evidence of whether the man in the kitchen was Jeff, what brought he and Ms. Davis to the apartment or what they were doing prior to being found there and/or whether he or Ms. Davis would confirm or contradict Ms. Hill's version of events. Of course, this is what beyond a reasonable doubt is all about. *In re Winship*, 397 U.S. 358 (1970). While it is true that it is not necessary for the Commonwealth to negate every possibility that someone other than the defendant possessed the gun, *Commonwealth v. Latney*, 44 Mass. App. Ct. 423, 426 (1998), the burden never shifts from the Commonwealth to prove every element of the offense charged including non-existence of facts or circumstances that would mitigate the degree of the defendant's culpability, *Mullaney v. Wilbur*, 421 U.S. 684 (1975); *Commonwealth v. Teixera*, 396 Mass. 746 (1986), a burden it failed to meet here.

The Commonwealth's burden includes proof that the defendant knew he was carrying a

8

firearm. *McQuoid v. Smith*, 556 F.2d 595, 598 (1st Cir. 1977). ". . . , mindful of the constitutional limitations imposed by *Lambert v. California*, 355 U.S. 225 (1957), and the need to avoid possible constitutional doubts, see *Commonwealth v. Buckley, supra* at 512, we interpret § 10 (*a*) as requiring, as a necessary element of the offense, proof that the accused knew that he was carrying a firearm." *Commonwealth v. Jackson*, 396 Mass. 904, 916 (1976).

The court's findings that proximity satisfies the knowledge element is erroneous.

"The fact that the defendant was in a confined area, namely, this narrow six-foot closet, with a gun in plain view, would satisfy the knowledge requirement that there was a gun." [Tr. II:80-82, RM, p.4].

Plain view supports an inference of knowledge if, unlike here, there is evidence that because the weapon was visible the defendant could have or should have know of its existence. As argued below, [Tab D, p.11], the weapon was not in plain view of the defendant because it was dark and more importantly because the defendant was hidden beneath a pile of clothes. In *Commonwealth v. Boone*, 356 Mass. 85 (1969)., the court held that ". . . mere presence in an automobile in which a firearm is found is not sufficient in itself to permit an inference that the defendant had knowledge of the presence of the firearm. *Id.* at 87. Presence must be coupled with some additional incriminating evidence to support an inference of knowledge. *Commonwealth v. Albano*, 373 Mass. 132, 134 (1977). In *Commonwealth v. Diaz* 15 Mass. App. Ct. 469 (1983), the additional incriminating evidence involved the officer's observation of the defendant, the sole occupant in the back seat of a car ducking down out of sight for a few seconds after the car was stopped and just prior to the officers observation of the gun on the floor immediately in front of the defendant. *Id.* at 470. In *Commonwealth v. Barbosa*, 49 Mass.

9

App. Ct. 344 (2000), the additional incriminating evidence consisted of the officer's observation of the defendant kicking something with his feet while seated in the car where the gun was found on the floor in front of where the defendant had been sitting. *Id.* at 347. *See generally, Commonwealth* v. *Collins,* 11 Mass. App. Ct. 583, 585-586 (1981) (inference warranted where firearms found in trunk of vehicle owned and operated by the defendant, who had ammunition for two of the guns in his pocket and had acknowledged having assisted his passengers in packing the trunk); *Commonwealth* v. *Lucido,* 18 Mass. App. Ct. 941, 943 (1984) (inference warranted where firearm located in locked glove compartment of vehicle operated by defendant, who possessed key to glove compartment and where letters addressed to him were found with gun); *Commonwealth* v. *Montgomery,* 23 Mass. App. Ct. 909, 910 (1986) (inference warranted where defendant was driver of vehicle registered to passenger, and defendant possessed ammunition clip for gun found on driver's side); *Commonwealth* v. *Reilly,* 23 Mass. App. Ct. 53, 55 (1986) (inference warranted where defendant left disabled vehicle on highway, children playing near that location two days later found briefcase and tool box which contained gun as well as various personal items and defendant acknowledged ownership of all items except gun). In all of these cases, unlike the instant case, evidence other than proximity was introduced to prove knowledge.

The instant case is analogous to *Commonwealth* v. *Almeida,* 381 Mass. 420 (1980) where the officer observed the defendant sitting in a parked car with the engine running who shifted in his seat as the officer approached. When asked for his license and registration the defendant lifted up the top of a console on the front seat, withdrew his wallet, and gave the officer his license. The officer did not see the defendant look into the console. *Id.* at 422. On

these facts the Supreme Judicial Court held:

> There was no evidence of the size of the console, or whether the gun was easily visible, to permit the jury to infer that the defendant would likely have seen or felt the gun when he put his wallet into the console. The jury would have had to speculate that the defendant knew the gun was in the covered console of a car he borrowed that evening, merely from his presence in that car. We believe the evidence was insufficient "to warrant a reasonable inference of personal knowledge of the presence of the gun." *Id.* at 423.

Here, as in *Almeida*, there is no evidence that the defendant saw or was otherwise aware of the gun in the closet. The defendant's presence late at night in an apartment where the owner was not present and where an unlicensed gun was found supports the inference that someone was engaged in illegal activity but not who. Proving who was closest to the gun does not prove who possessed it. On the undisputed facts in this case the court's finding is nothing more than impermissible speculation. *Commonwealth v. Caterino*, 31 Mass. App. Ct. 685, 688, 690 (1991)(a conviction can not rest upon speculation or conjecture). "Mere speculative inferences are never allowable, and cannot be regarded as evidence." *Goodman v. Simonds*, 61, U.S. 343, 360 (1857). Accordingly, the defendant's conviction is contrary to clearly established federal law and is the product of impermissible speculative inferences unsupported by the facts of the case.

**IV.    At the Conclusion of the Enhanced Sentencing Trial the Defendant was Entitled, as a Matter of Law, to a Required Finding of Not Guilty and it was Ineffective Assistance of Counsel to Fail to Move for a Directed Verdict.**

The Judge, who was the trier of fact in both trials, may not rely on evidence presented to establish the identity of the defendant at the first trial, unlawful possession trial, to conclude that the defendant who stands before her in the second trial, enhanced sentencing trial, is the same individual who was just convicted of unlawful possession or the same individual whose name

11

appears on three certified copies of prior convictions..

Putting aside, without waiving the hearsay argument raised by the defendant on appeal, [Tab D, p.16-24], the substantive issue that neither the Trial Court or Appeals Court addressed is the statutory prohibition against subsuming evidence from the first trial into the second. In analyzing the applicability of this statutory prohibition to the instant case, the defendant does not argue that fingerprints from all four booking sheets were not those of the same individual, or that the certified copies of three prior convictions introduced at the second trial do not establish that this individual did not have three prior convictions. Rather the defendant argues (A) that there was no evidence introduced at the second trial, certified conviction or otherwise, to prove that he was convicted at the first trial, nor (B) was there any evidence introduced at the second trial that would allow the trier of fact to conclude that the defendant was the same individual named in the certified copies of three prior convictions.

The conclusion of the Trial Court, [Tab I, p.6,7], and of the Appeals Court, [Tab F, p.1], that a motion for a required finding of not guilty would have been futile because the fingerprint evidence elicited from officer Prentice at the second trial, that fingerprints contained in four separate booking sheets belonged to the same individual, one Michael L. Garner, with a date of birth of 7/27/61 was sufficient for the trial judge to conclude that the defendant in court was the same individual who committed three prior criminal offenses, [Tab F, p.2, FN2], is proved only if the Judge were allowed, as she is not, G.L.c. 278, § 11A, to consider evidence from the first trial in the second trial. *Commonwealth v. Koney*, 421 Mass. 295, 302 (1995)(The separate trial requirement of G.L.c. 278, § 11A, precludes the judge from relying on any evidence that had been presented at the first trial, the underlying offense, to establish identity.)

A.) - No Evidence of Underlying Conviction

The trial judge, understandably, assumed that because one of the booking sheets, testified to by Officer Prentice, relates to the trial where she just found the defendant standing before her guilty he is the same individual. [Tab I, p. 6,7]. This assumption, however, ignores the Chinese Curtain that the statue erects between the first and second trial. Though the court may take judicial notice of its docket and pleadings in a case, Commonwealth brief [Tab E, p.25,26], and Appeals Court holding, [Tab F, p.1], the purpose of evidence is to resolve the factual issue of identity, and judicial notice, which is ordinarily reserved for matters of common knowledge and "matters verifiable by authoritative sources", [fn3][3] cannot be taken of material factual issues that can only be decided by the fact finder on competent evidence. *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. 225, 229 (1995) citing, *Commonwealth* v. *Kingsbury*, 378 Mass. 751, 754-755 (1979).

B.) - No Identification of Second Trial Defendant.

As the Commonwealth points out in its brief, only at the first trial was the defendant identified as the individual accused of and then convicted of the underlying crime.

> The defendant, Michael Garner, was properly identified as the individual arrested on November 6, 1998 of a firearms charge, and was convicted of this charge on September 7, 1999. (Tr. I/46,106). [Tab E, p.24, note: the reference to Tr.I/46/106 equates to Supplemental Answer (Transcripts) Vol. II – Trial, same pages, i.e. the transcript of the first trial].

---

[3]  [fn3] While the judge, or this court, may take judicial notice of the records and files of the court in the same case or in ancillary proceedings, see Liacos, Massachusetts Evidence § 2.8.1, at 43, such records ordinarily may not be used for substantive purposes. Thus, in *Brookline* v. *Goldstein*, 388 Mass. 443 (1983), the Supreme Judicial Court considered the pleadings in other cases which had been submitted to the judge "*solely* to discover the nature of the claims asserted" (emphasis added). *Id.* at 447 n. 5.

There is no factual dispute that Officer Prentice did not know and could not identify the defendant at bar as being the person whose fingerprints he had compared. [Tr. II:128,129]. Nonetheless the Appeals Court held that ". . . the fingerprint evidence alone provided sufficient evidence indicating that the defendant in court was the same individual who committed three prior offenses." Tab F, p.2 (FN2) . This statement belies the Appeals Court reliance on the distinction between *Commonwealth* v. *Koney*, 421 Mass. 295, 301-302(1995), where court documents of three prior convictions of a Roger Koney were insufficient to identify the defendant as the same individual, and *Commonwealth* v. *Olivo*, 58 Mass. App. Ct. 368, 372-373 (2003), where evidence at the second trial included more than the mere identity of names to uphold the conviction. In *Olivo* the record was incomplete as to what additional identifying information was given. and thus whether or not it included a physical description, that would allow the jury to conclude that the individual identified was the individual they saw sitting before them. *Id.* at 372 and n.6. Here, the record is complete and the Appeals Court found that "While it is intimated that the biographical information in the four booking sheets was similar, there was no direct testimony on the subject, nor were the booking sheets admitted into evidence. Tab F, p.2(FN2). Accordingly, the only evidence introduced at the second trial is that an individual named Michael Garner with a birth date of July 27, 1961 was booked on four different occasions and convicted on three of these occasions. Having the same name does not establish identity. *Commonwealth* v. *Koney* 421 Mass. 295, 302 (1995), citing *Herman* v. *Fine*, 314 Mass. 67, 68-69 (1943). What additional evidence is necessary and whether a date of birth would suffice in a criminal case is unclear and, here, irrelevant because there was no evidence introduced at the second trial as to the date of birth of the defendant nor is his date of birth

14

contained in the record on appeal. In sum, the only identification of the defendant as an individual who committed a crime is his identification in the first trial. Accordingly, filing a motion for a required finding of not guilty can not be said to have been frivolous and thus trial counsel's failure to do so amounts to ineffective assistance of counsel. *Strickland* v. *Washington*, 446 U.S. 668 (1984), *Commonwealth* v. *Saferian*, 366 Mass. 89 (1974).

### Conclusion

For all the forgoing reasons the petition for habeas corpus should be allowed.

The petitioner requests a hearing on the petition.

Respectfully submitted,
The Petitioner
by his attorney,

*/s/ Thomas N. Turner*

Thomas N. Turner
P.O. Box 152
Spruce Head, ME 04859
(207) 594-0960
BBO # 562153

Dated: October 31, 2005

### CERTIFICATE OF SERVICE

I, Thomas N. Turner, attorney for the Petitioner in the above-entitled matter, hereby certify that I have sent by first class mail, postage prepaid, a copy of the above Memorandum of Law in Support of the Petition to AAG David M. Lieber, Office of the Attorney General, One Ashburton Place, Boston, MA 02108, this 31st day of October 2005.

*/s/ Thomas N. Turner*

Thomas N. Turner